**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **KIARA EDWARDS on behalf of L.T.** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12 C 7639 |
| ) | |
| v. ) | Magistrate Judge Daniel G. Martin |
| ) | |
| **CAROLYN COLVIN** ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kiara Edwards filed this action on behalf of her minor son, L.T., seeking review of

a final decision of the Commissioner of Social Security ("Commissioner") that denied L.T.'s

claim for Social Security Income under Title XVI of the Social Security Act.  42 U.S.C. §

1382(c).  The Commissioner has filed a cross-motion.  The parties have consented to have

this Court conduct all proceedings in this case, including an entry of final judgment.  28

U.S.C. § 636(e); N.D. Ill. R. 73.1(c).  For the reasons discussed below, both Plaintiff's and

the Commissioner's motions are granted in part.

## I.  Legal Standard

### A.    The Social Security Administration Standard

Prior to 1996, a child was considered disabled if he or she had a physical or mental

impairment that was of comparable severity to one that would disable an adult.  42 U.S.C.

§ 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996); *Scott v. Barnhart*, 297 F.3d 589, 593-

94 (7th Cir. 2002).  Congress altered this standard under the Personal Responsibility and

Work Opportunity Reconciliation Act ("PRWORA") to require a higher showing by a minor

claimant.  *Scott*, 297 F.3d at 594 n.5.  A child is considered disabled under PRWORA if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp.2d 776, 779-80 (N.D. Ill. 2002).

To determine if such an impairment exists, the Social Security Administration ("SSA") has promulgated regulations that limit the familiar five-step process that applies to adults to only three steps.  The ALJ must answer three questions: (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or (unique to child claimants) functionally equal one of a list of severe impairments set forth in the Listings?  20 C.F.R. § 416.924(b)-(d).  An affirmative answer at Step 1 ends the analysis, and a child must be found not to be disabled regardless of his age or medical condition.  20 C.F.R. § 416.924(b).  A negative answer at Step 2 also requires a finding that the child is not disabled.  20 C.F.R. § 416.924(c).

Unlike the Step 3 requirements that apply to adults, the regulations state that a child satisfies the third step when her condition "functionally equals" a listed impairment.  20 C.F.R. § 416.924(d).  This requirement permits a finding of disability if a child's impairment or combination of impairments results in one of two possible findings.  First, the impairments must give rise to "marked" limitations in two of six "domains of functioning," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well being.  20 C.F.R. §§ 416.926a(a) & 416.026a(b)(1)(i)-(vi).  A limitation is marked if it "interferes seriously" with a child's ability

to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id*.

In the alternative, impairments functionally equal a listed requirement when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.92a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It reflects the functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id.*

## B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668,

673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott*, 297 F.3d at 595. Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A. School and Medical Records

L.T. was initially placed in special education classes in the first grade due to a diagnosis of attention deficit/hyperactivity disorder ("ADHD"). (R. 65). He was thirteen years old at the time of the hearing and a student in the seventh grade. The first of several Individualized Education Program ("IEP") meetings identified in the record took place on April 13, 2009.[1] The IEP noted that L.T. had been successful in school due to the modifications and supports that were provided to him. This included 40 minutes a week of direct social work support, modified tests, and specialized groups. Specific goals and modifications were laid out for L.T., including open book tests and frequent breaks. He was placed within a regular class setting for 81% of the day, though he received the special education services provided for in the IEP. (R. 140-51).

L.T. was also receiving regular psychiatric treatment at that time from Dr. Huma Pandit, who initially diagnosed him with ADHD and a single episode of severe depression.

---

[1] An IEP is a statement developed by parents, teachers, and school representatives under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq*. The IEP lays out guidelines for providing educational services that take account of a child's specific needs. *See Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905-06 (7th Cir. 2002).

(R. 300).  Dr. Pandit noted that L.T. had been hearing a voice that told him to hurt others and that he made suicidal statements at school.  A treatment note from the Woodridge Clinic in January 2007 states that L.T. could not sleep because he "sees dead people." (R. 351).

L.T. was already taking Adderall for ADHD when he first saw Dr. Patel, and he had previously taken Concerta.  Dr. Pandit prescribed Focalin.  He was also given fluoxetine (Prozac) for depression.  L.T. continued to see Dr. Pandit through March 2011.  Dr. Pandit's treatment notes reflect variable functioning, with a later diagnosis of a recurring major depression with psychotic features.  (R. 531).  The psychiatrist noted that L.T. generally did well, though he was suspended from school in February 2011 after "pulling a kid by his collar."  (R. 554).

A follow-up IEP in March 2010 placed greater restrictions on L.T.'s functioning.  The 2009 IEP had only required 325 minutes a week of special education classes in reading, math, and written expression.  (R. 148).  It also provided for 120 minutes of special education services in regular class settings.  The new IEP significantly increased L.T.'s special education placement.  He now received 23.3 hours of special education, including new services in reading, homebase, resource, and math classes.  (R. 460).  L.T.'s participation in regular classroom settings was reduced to 50% of the day.  (R. 462). Scores from the Wechsler Individual Achievement Test ("WIAT – II") showed that L.T. was performing at an average level in most academic areas such as reading comprehension, math, and listening comprehension.  (R. 445).

A third IEP in March 2011 limited L.T. to a more restrictive school environment, with only a 48% placement in general education, and with special education services provided

for 59% of his education.  (R. 248).  The IEP notes that L.T. had average reading skills but became "overwhelmed in the regular classroom."  (R. 243).  He required a writing prompt to perform "common and simplistic" tasks, and could solve simple arithmetic problems with the help of a multiplication chart.  (R. 243-45).

### B.    State Agency Reports

In September 2009, Dr. Lenore Gonzalez and Dr. Michael Schneider issued a Childhood Disability Evaluation Form for the SSA.  They concluded that L.T. suffered from ADHD, a learning disability, depression, and asthma, but that these impairments did not meet, medically equal, or functionally equal a Listing.  As part of the evaluation, the state agency physicians assessed the six functional domains that are considered when determining if a severe impairment functionally equals a listed impairment.  The physicians found that L.T. had no limitation in moving about and manipulating objects.  A "less than marked" limitation was found in the other five functional areas of acquiring and using information, attending and completing tasks, interacting with others, caring for oneself, and health and physical well being. (R. 424-25).  These findings were upheld on reconsideration by Dr. Cosme Cagas and Dr. John Tomassetti.  (R. 429-33).

### C.    Hearing Testimony

L.T. appeared at a March 29, 2011 hearing before administrative law judge ("ALJ") James Horn.  L.T. stated in his short testimony that he lives with his mother and brother. He has three teachers for each of his classes and is active in intramural sports.  L.T. sees the school's social worker once a week, and they work on ways to solve behavioral problems that arise.  (R. 61-64).

L.T.'s mother also testified at the hearing. She stated that L.T.'s depression had improved with treatment, but he is sometimes sad and withdrawn. L.T. has seen a psychiatrist once a month for two years. He participates in intramural activities each day for an hour before school starts. L.T.'s most significant problem is that he forgets to do daily tasks such as brushing his teeth and taking his medication. She must remind him to do so up to five times a day. (R. 65-74).

### D.    The ALJ's Decision

ALJ Horn issued a written decision on May 18, 2011 finding that L.T. was not disabled. He determined at Step 1 that L.T. had not engaged in substantial gainful activity since his SSA application date. At Step 2, the ALJ found that L.T.'s severe impairments included depression and "a suggestion" of ADHD. These impairments did not meet or medically equal a listed impairment at Step 3. The ALJ then determined that L.T.'s impairments did not functionally equal a Listing by evaluating the six domains of functioning outlined in the regulations. He found that L.T. had no limitations in moving about or manipulating objects. Less than marked limitations were found in the domains of acquiring information, completing tasks, interacting with others, caring for oneself, and physical well being. Based on this analysis, the ALJ concluded that L.T. was not disabled. (R. 11-22).

### III.  Discussion

L.T.'s mother, Ms. Edwards, challenges the ALJ's decision on two grounds. She claims that: (1) the ALJ erred by not calling a medical expert to testify at the hearing, and (2) substantial evidence does not support the ALJ's analysis of L.T.'s ability to acquire information, attend to and complete tasks, and his capacity to interact with others. The

7

Court addresses each issue in turn.

## A.     The ALJ Did Not Err By Not Calling a Medical Expert

Social Security Ruling 96-6p requires an ALJ to consider opinions given by state agency medical experts when considering disability claims.  ALJs are not automatically bound by such medical opinions, but they "may not ignore [them] and must explain the weight given to the opinions in their decisions."  SSR 96-6p.  When medical evidence in the record calls into question the report of a state agency physician, an ALJ must call on a medical expert to update the state agency report.  Plaintiff contends that SSR 96-6p required the ALJ in this case to obtain such an updated medical opinion.  In response, the Commissioner cites 20 C.F.R. § 416.927, which SSR 96-6p interprets.  The Commissioner notes that an ALJ is not required to seek out the opinion of a medical expert if the medical record is sufficiently detailed about the claimant's impairment.

Both Plaintiff and the Commissioner rely on the standards described in SSR 96-6p to support their respective arguments.  That Ruling, however, only applies to the question of whether a claimant's impairments meet or medically equal a Listing.  It does not address the "functionally equals" issue that arises in child disability claims.  The SSA has specifically exempted ALJs from obtaining an updated medical opinion when they consider whether a child's impairment functionally equals a Listing:

> While SSR 96-6p requires that an ALJ or the AC [Appeals Council] must obtain an updated medical expert opinion before making a decision of disability based on medical equivalence, there is no such requirement for decisions of disability based on functional equivalence.  Therefore, ALJs and the AC (when the AC makes a decision) are not required to obtain updated medical expert opinions when they determine that a child's impairment(s) functionally equals the listings.

SSR 09-1p.  Plaintiff correctly notes that SSR 96-6p can require a medical expert to provide

8

a fresh review of the record when medical equivalence is at issue. But Plaintiff's argument in this case is that the ALJ erred in considering the *functional* equivalence of L.T.'s impairments. Social Security Ruling 96-6p does not apply to such an analysis. *See A.H. ex rel. Williams v. Astrue*, No. 09 C 6981, 2011 WL 1935830, at *18-19 (N.D. Ill. May 18, 2011).

Plaintiff argues that a medical expert was especially important in this case because 42 U.S.C. § 1382c(a)(3)(i) requires an ALJ to obtain expert review when considering a child's alleged impairments. That statute states:

> In making any determination under this title . . . with respect to the disability of an individual who has not attained the age of 18 years . . . the Commissioner of Social Security shall make reasonable efforts to ensure that a qualified pediatrician or other individual who specializes in a field of medicine appropriate to the disability of the individual . . . evaluates the case of such individual.

42 U.S.C. § 1382c(a)(3)(i). According to Plaintiff, no medical expert reviewed L.T.'s complete record after Dr. Cagas and Dr. Tomassetti issued their assessment for the SSA in February 2010. Plaintiff points out that two new IEPs were issued after this report that changed some of the terms of L.T.'s special education needs.

The Court respectfully disagrees that § 1382c(a)(3)(i) requires remand because the ALJ did not call a medical expert. The scope of that statute is more limited than Plaintiff's argument accounts for. It is true that the statute's intent is to ensure that a qualified expert reviews a child's medical record as a whole. *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1014 (9th Cir. 2003). But the SSA process for disability claims includes a number of administrative review levels, and § 1382c(a)(3)(i) does not require a child's record to be reviewed anew by a medical expert at each one. It only mandates a comprehensive

medical review at the initial and reconsideration stages, not at the ALJ level that is before the Court now. *See A.H. ex rel. Williams*, 2011 WL 1935830, at *19-20 (noting that under Acquiescence Ruling 04-1(9), § 1382c(a)(3)(i) only requires a comprehensive review at the ALJ level in the Ninth Circuit).[2] State agency physicians reviewed L.T.'s records before Ms. Edwards' application on his behalf was denied initially on September 24, 2009 and again upon reconsideration on February 5, 2010. Strictly speaking, that is all that § 1382c(a)(3)(i) requires. Defendant's motion is granted on this issue.

## B.     The ALJ Erred at Step 3

The ALJ determined at Step 3 that L.T.'s impairments did not meet or medically equal the Listings for depression or ADHD. For an adult claimant, such a finding would end the Step 3 analysis. For a child, however, an ALJ must further consider whether the claimant's impairments are functionally equivalent to a Listing. An ALJ does so by deciding whether the child has marked or extreme limitations in the six domains of functioning noted earlier. 20 C.F.R. § 416.926a(a). Plaintiff claims that the ALJ erred by finding that L.T.'s limitations in acquiring information, attending and completing tasks, and interacting with others were less than marked.

The Commissioner claims that the ALJ's decision on these functional domains is supported by the two Childhood Disability Evaluations that were submitted by Drs. Gonzales, Schneider, Cagas, and Tomassetti. The evaluations found that L.T.'s limitations

---

[2] The *A.H.* court recognized that it was possible that AR 04-1(9) was not entirely consistent with the requirements of §1382c(a)(3)(i). The court did not address the full extent of that issue because the parties did not raise it. Instead, the *A.H.* court followed other authorities in applying AR 04-1(9). *A.H. ex rel. Williams*, 2011 WL 1935830, at * 20. This Court follows the same reasoning because neither party has addressed the issue.

in the three domains Plaintiff identifies were less than marked. These reports could have provided substantial evidence to support the decision if the ALJ had taken note of them or discussed them in some way. As it stands, however, the ALJ never cited the state agency physicians to bolster his findings.[3] Courts cannot supply reasons the ALJ did not cite, even if substantial evidence in other parts of the record supports the ALJ's finding. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Baker ex rel. Baker v. Barnhart*, 410 F. Supp.2d 757, 766 (E.D. Wis. 2005). As a result, the Commissioner cannot rely on the state agency reports to argue that substantial evidence supports the ALJ's decision.

The Commissioner also relies on L.T.'s school records. The relation between the school records and the domains of functioning is described below. Before addressing that issue, the Court first expresses a broad concern over the limited notice the ALJ took of the record in his decision. The ALJ cited only three pages of L.T.'s school records to support his functional equivalence analysis.[4] (R. 15-16). He failed to take cognizance of almost all aspects of L.T.'s special education needs set out in detail in the IEPs themselves. The only reference to special education at all (other than briefly noting that "he has been in special

---

[3] The ALJ did state in broad terms that he considered opinion evidence in the record. (R. 15). However, this statement is part of the boilerplate recitations the ALJ included concerning the standards that apply to child disability claims. The majority of the ALJ's Step 3 analysis consists only of such boilerplate language. The ALJ's actual analysis makes clear that he did not follow all these guidelines. He stated, for example, that he considered the "whole child" and compared claimant to other children his age who did not have impairments. Nothing in the ALJ's discussion directly addresses these issues. Similarly, the decision makes no reference to the state agency Childhood Disability Evaluations.

[4] The ALJ referred to Ex. 11F at page 5 (R. 445) and Ex. 17F at pages 5 and 6 (R. 570-71). Almost all of the ALJ's discussion of L.T.'s school records can be derived from these pages.

education services," R. 17) was the ALJ's acknowledgment that Ms. Edwards stated that L.T. had been in special education since the first grade. (R. 16). Instead of discussing the specific information provided in the IEPs, the ALJ's only analysis of L.T.'s special education records was that they "track along the domains that are assessed in the childhood disability evaluation." (R. 15, 16).

The Court cannot follow the basis of the ALJ's reasoning on this issue. The IEPs do not "track" the disability analysis, at least in any meaningful sense, because they do not categorize L.T.'s functioning into the domains that are used in evaluating child claimants. Insofar as the ALJ believed that the IEP data supported his domain analysis, he failed to explain how the "tracking" on which he relied operated. Social Security Ruling 09-1p, which addresses the standards used in evaluating children, directs adjudicators "to provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09-1p. After a careful review of the record, the Court finds that the ALJ did not follow this directive.

A limited record review does not automatically require remand, as it is always possible that the evidence an ALJ relies on is sufficient to support his findings. In this case, however, the Court is troubled by the lack of explanation and supporting evidence the ALJ provided for the first two of L.T.'s functional domains. An ALJ must always make a meaningful connection between the evidence and his conclusions. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Even if enough evidence exists to justify the ALJ's decision, a court must remand it when "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Id*. *See also Steele*, 290 F.3d at 941. The ALJ's explanations in this case are insufficient for the reasons discussed below.

12

### 1. Acquiring and Using Information

This functional domain involves "how well you acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). The regulations concerning all functional domains identify tasks that a child should be able to perform within specific age ranges. L.T. transitioned between the school-age range (6-11) and adolescent category (12-18) outlined in the regulations. A younger child should be able to "follow directions, remember and organize [his] school materials, and complete classroom and homework assignments." 20 C.F.R. § 416.926a(g)(2)(iv). This includes an ability to read by oneself, complete family chores, and finish activities without unduly distracting oneself or others. *Id*. An adolescent must satisfy stricter requirements:

> In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(g)(2)(v).

Social Security Ruling 09-3p directs ALJs to consider whether a child receives special education as part of the first functional domain. This includes issues such as the need for a personal aide, special accommodations, special teaching methods, and classroom settings. That said, being placed in either regular or special education is not always a sign that a child does, or does not, have serious limitations. The regulations state:

> The fact that you do or do not receive special education services does not, in itself, establish your actual limitations or abilities. Children are placed in special education settings, or are included in regular classrooms (with or

without accommodation), for many reasons that may or may not be related to the level of their impairments.

20 C.F.R. § 416.924a(b)(7)(iv). Contrary to these well-established guidelines that call for careful consideration of a child's placement, the ALJ justified his finding on the first domain by stating that L.T. was "in some regular classes" when he was not receiving special education services.[5] (R. 17).

The Court cannot follow the reasoning that links this truncated acknowledgment of L.T.'s educational setting and the ALJ's conclusion on the first domain. No explanation of the ALJ's logic was provided. That may have been, in part, because the ALJ ignored virtually all of the specific features of L.T.'s special education. He did not note, for example, that L.T.'s placement in regular classrooms dropped sharply from 81% of each day in 2009 to only 48% in 2011. (R. 150, 248). The March 2010 IEP included anywhere from one to 7.5 hours of special education services for writing, reading, language arts, homebase, resource, and math. (R. 460). L.T.'s testimony, which the ALJ found to be credible, stated that he needed at least three teachers in each class.

L.T. also received numerous accommodations that are set out at length in the IEPs. (R. 460). These include open book tests, extra test time, having tests read to him, and preferential seating. The ALJ did not cite any of these facts. Ruling 09-3p specifically directs ALJs to consider "front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring." SSR 09-3p. The ALJ may have been

---

[5] It is not clear the degree to which the ALJ considered that a child in a regular education setting may still be receiving special education services. The IDEA requires a special education student to be "mainstreamed" by being placed in the least restrictive environment. *Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002). That is frequently a regular classroom, with supports designed to meet the child's IEP goals.

entitled to conclude that the extent of L.T.'s special education was not sufficient for finding a marked limitation in this domain had he taken account of these crucial issues. But the ALJ could not reach that conclusion without referencing the basic outlines of L.T.'s educational setting and discussing the issue in some manner. As SSR 09-3p states, the ALJ's comment that L.T was placed in "some" (albeit, increasingly fewer) regular classrooms is not sufficient without further discussion to establish what his capacity to acquire and use information is.

The same Ruling also requires an ALJ to consider whether a child receives psychological and counseling services. L.T. testified at the hearing that he saw a social worker at school each week for behavioral issues. The March 2010 IEP confirms that claim. (R. 461). The ALJ noted that L.T. was part of a small group that met to discuss behavioral problems. (R. 16). However, the record shows that this group was separate from L.T.'s individualized social services. (R. 142). The ALJ did not take account of L.T.'s need for these sessions with the social worker. He also overlooked that L.T. had a long-term treatment relationship with psychiatrist Dr. Pandit. That may be why the ALJ concluded at Step 2 that L.T. only suffered from a single episode of severe depression.[6] That was Dr. Pandit's initial diagnosis. Many subsequent evaluations altered the diagnosis to recurring depression with psychotic features. (R. 506, 511, 516, 521, 526, 531, 536, 544, 552, 558, 563). The ALJ appears to have been unaware of this fact. He also failed to note that L.T. was treated with fluoxetine (Prozac) for his depression. (R. 170).

The ALJ cited the fact that L.T.'s grades were largely A's, B's, and C's. (R. 16, 17).

---

[6] It is less clear why the ALJ concluded at Step 2 that only a "suggestion" of ADHD was present. (R. 14). The record is replete with diagnoses of this disorder.

Test scores are an appropriate factor to consider when evaluating a child's disability. 20 C.F.R. § 416.924a(a)(1)(ii). However, the ALJ could not simply rely on the fact that L.T. received A's, B's, and C's without further discussion. Grades must be carefully considered when they are given in the context of a specialized environment. The regulations state that an ALJ should "consider that good performance in a special education setting does not mean that you are functioning at the same level as other children your age who do not have impairments." 20 C.F.R. § 416.924a(b)(7)(iv). Accordingly, SSR 09-3p requires a comparison between a child's functioning and that of "same-age children without impairments." SSR 09-3p. The Commissioner does not contend that the ALJ complied with this important requirement in any part of his child disability evaluation. Very liberally construed, the only possible approach to the issue was an acknowledgment that L.T.'s standardized test scores under the WIAT-II exam were largely in the normal range.

Even if the ALJ intended this as a comparison between L.T. and his peers – and the ALJ did not state that it was – citing the WIAT-II scores does not satisfy the ALJ's burden of explanation under these facts. The ALJ's only analysis of L.T.'s standardized scores was that they "are not that bad." (R. 15). This overlooked entirely that these scores were measured under conditions considerably different from those that applied to non-impaired children. The 2010 IEP states that L.T. could only be tested for district and state assessments with specific accommodations. These included extended time, having the tests read to him, an alternative setting, highlighted key words, additional breaks, a flexible schedule, and manageable test segments. (R. 463). The ALJ could not rely on L.T.'s intelligence tests to support his conclusion without accounting for how the tests were administered.

The ALJ also could not rely on L.T.'s test scores without discussing how L.T.'s behavioral issues affected his ability to function in the first domain. Social Security Ruling 09-3p acknowledges that a child's functioning can outweigh his test scores in this area. Thus, an ALJ must "consider[ ] more than just assessments of cognitive ability as measured by intelligence tests, academic achievement instruments, or grades in school." SSR 09-3 ("Both mental and physical impairments can affect a child's ability to acquire and use information."). The issue was especially important in this case because the March 2011 IEP noted that it was L.T.'s behavior that posed one of the greatest obstacles to learning. *See* Record at 238 ("Historically, [L.T.]'s behavior has been a significant component to his ability to access the school curriculum on a daily basis."). The IEPs also clearly stated that the reason why L.T. was placed in special education was his "emotional disability," not a limitation in his intelligence level. (R. 448).

The ALJ did acknowledge that L.T.'s "emotional state led to disruption and his mental readiness to learn in the classroom on occasion." (R. 17). This comment suggests that the ALJ recognized L.T.'s emotional problems but simply did not believe that they were severe enough to constitute more than a "less than marked" limitation. That conclusion is not necessarily wrong in itself. But the ALJ was again required to explain it in a way that would allow the Court to follow the basis of his reasoning.

The problem with the ALJ's reasoning is that the record shows that L.T.'s behavioral issues were problematic more than just "on occasion." They were pervasive. The 2009 IEP, which the ALJ ignored, noted that L.T. was required to keep a "feelings chart" and engage in a "rough spot training program" to mitigate his emotional disruptions. (R. 142, 147). Indeed, the IEP is full of references to L.T.'s difficulties in handling academic and

17

social frustrations.  Both the 2010 and 2011 IEPs stated that L.T. is "easily frustrated and engage[s] in inappropriate behaviors or refusal" in class.  (R. 446, 239).  L.T. had learned the basics of the "rough spot training" by 2011, but he still needed to learn how to generalize those skills to remain calm.  (R. 242).  Even then, school officials believed that he should be placed in a specialized setting to keep him apart from other students who triggered his emotional outbursts.  (R. 250).

Insofar as the ALJ considered how L.T. could function compared to non-impaired children despite his behavioral issues, he was required to account for the fact that L.T. was placed in increasingly restrictive school settings from 2009 to 2011.  Moreover, L.T. turned 12 before the March 2010 IEP was issued.  Under the regulations, he was expected to perform increasingly difficult tasks in this domain on reaching that age.  The ALJ did not explain how L.T.'s capacity to meet these heightened goals was less than marked when L.T. required additional educational services as he transitioned from school age to adolescence.

To do so, the ALJ would have needed to address the accommodations provided to L.T.  Social Security Ruling 09-2p lays great stress on the supports given to a child in special education:

> This information about supports children receive can be critical to determining the extent to which their impairments compromise their ability to independently initiate, sustain, and complete activities.  In general, if a child needs a person, a structured or supportive setting, medication, treatment, or a device to improve or enable functioning, the child will not be as independent as same-age peers who do not have impairments.  We will generally find that such a child has a limitation, even if the child is functioning well with the help or support.  The more help or support of any kind that a child receives beyond what would be expected for children of the same age without impairments, the less independently the child functions, and the more severe we will find the limitation to be.

18

SSR 09-2p. By failing to address the specific limitations and supports that are set out in the IEPs, the ALJ overlooked the accommodations that allowed L.T. to function in the first domain almost entirely.

An ALJ is never required to consider every piece of evidence, and SSR 09-1p exempts an adjudicator from necessarily discussing every factor that is part of a child's disability analysis. Under these facts, however, the ALJ's limited record review, combined with the sparse analysis of the domains, precludes SSR 09-1p from providing a safe harbor because the ALJ did not build a logical bridge between the evidence he cited and his findings on L.T.'s ability to acquire and use information. Plaintiff's motion is granted on this issue.

### 2. Attending and Completing Tasks

The second functional domain considers how well a child begins, carries through, and completes activities, as well as the pace at which they are performed. 20 C.F.R. § 416.926a(h). Attention involves a child's level of alertness, ability to filter out distractions, and the capacity to change focus when interruptions occur. 20 C.F.R. § 416.926a(h)(1)(i). Children over the age of 12 should be able to pay attention to increasingly longer written and oral presentations, maintain concentration while reading, organize and manage their time properly, and maintain attention on tasks for extended periods. 20 C.F.R. § 416.026a(h)(2)(v).

The ALJ only briefly explained his finding on this domain, stating first that L.T.'s "impulsiveness was significantly increased when he did not take his medication." (R. 18). The ALJ also found that claimant was able to function independently "with some additional help." (R. 18). A child's ability to function independently is crucial to all of the domains of

functioning. Social Security Ruling 09-1p stresses that an ALJ must always consider the degree to which a child can "independently initiate, sustain, and complete activities." SSR 09-1p. The Court cannot discern how the ALJ went about assessing this issue. The ALJ's cryptic finding that L.T. could be independent with additional assistance explains very little. It is far from clear, for example, how a child can be independent if he needs help to do so. These may not be entirely contradictory terms in the context of special education, but the ALJ made no attempt to elucidate the basis of his finding.

Part of that reasoning should have included a discussion of the "additional help" that L.T. required. The school records demonstrate that L.T. could function to some degree with the assistance of a broad array of special education services. As the ALJ failed to note almost all of those services, he necessarily failed to explain how L.T. could function independently with their aid. Most troubling in this respect is that the ALJ gave no attention to the fact that L.T. went from receiving 325 minutes of special services each week in 2009 to 23.3 hours in 2010. That is more than a 400% increase. By March 2011, he received special education services 59% of each day. (R. 248). If the ALJ believed that this increased need for services allowed L.T. to be independent, he was at least obligated to take note of L.T.'s need for them and to compare that fact to non-impaired children his age who function without special services.

As with the first domain, the ALJ would also have needed to account for the fact that the regulations required L.T. to be able to perform increasingly complex tasks as he transitioned from the 6-11 age range to the 12 and older category. An older child should be able "to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting." 20 C.F.R.

§ 416.926a(h)(2)(v). The ALJ's limited record review overlooked that the March 2011 IEP stated that L.T. was "easily frustrated" and that he required an "organized, structured and predictable" environment that separated him from peers "that trigger or escalate his behavior." (R. 239, 250). The ALJ provided no explanation of how L.T. measured up to the heightened attention requirement for an adolescent when school officials believed that he needed a more protected school environment to shield him from the distractions of other students.

The ALJ's recognition that L.T.'s medication reduced his impulsiveness may have been intended to explain this issue, although he did not directly link medication to L.T.'s independence.[7] But the fact that L.T.'s medication improved his ability to learn does not, at least without further discussion, explain why L.T.'s limitation in this domain was less than marked. The fact that a child's functioning has improved does not explain why the child has reached a specific functional level. A child can improve with medication and still have profound limitations. For this reason, courts have rejected an ALJ's reliance on improvement alone as a substitute for analyzing the child's actual functioning. *See A.H. ex rel. Williams*, 2011 WL 1935830, at *11; *Sewell ex rel. HMC v. Comm. of Social Sec.*, No. 10-12520, 2011 WL 3566471, at *9 (E.D. Mich. July 20, 2011); *see also* SSR 09-1p (stating that a child who needs medication to improve his functioning "will have a limitation" that

---

[7]    The ALJ stated that L.T. was observed not to be taking his medication on occasion, and that had a negative impact on his school performance. The record does not fully support that conclusion. The pages cited by the ALJ only state that L.T. "may" not have taken his medication at times, not that he actually failed to do so. (R. 238). The ALJ did not cite any part of the record showing that L.T. was actually non-compliant with his medication. He also did not attribute any specific part of L.T.'s functioning to his alleged non-compliance.

indicates a reduced level of independence compared to other children his age).  The ALJ's task was not to point to generalized improvement, but to explain with some degree of clarity why L.T.'s limitation was – in fact – less than marked when compared to non-impaired children his age.

As before, this would have involved considering the many special education supports that L.T. received.  The IEPs note that L.T. could read with the assistance of a prompt.  (R. 250).  He also required "adult prompts," though he "struggles with listening" to them.  (R. 238).  The ALJ noted the second prompt, though he provided no explanation of why it supported a finding  that L.T.'s limitations were less than marked.  Ruling SSR 09-4p, which controls this domain of functioning, specifically addresses prompts, explaining that "[d]espite the fact that the child is paying attention with prompting, this child is not functioning well in [the second] domain."  SSR 09-4p.  The March 2011 IEP also stated that L.T. wants to complete his work, but he "can become easily frustrated and engage in inappropriate behaviors or refusal."  (R. 239).  The ALJ did not consider that limitation, even though SSR 09-4p warns that children with ADHD are often "easily distracted or have difficulty focusing on what is important and staying on task."  SSR 09-4p.

This does not mean that the ALJ was necessarily required to find that L.T. had a marked limitation in his ability to pay attention.  What he could not do, however, was to reach his conclusion without accounting for the structure, supports, and behaviors that were relevant to comparing L.T. to other children.  The ALJ was required to take the "whole child" approach described in the regulations and Rulings.  Social Security Ruling 09-1p instructs an ALJ to begin a functional equivalence analysis "by considering how the child functions every day and in all settings" compared to other children.  SSR 09-1p.  This includes a

comprehensive view of a child's activities in "everything a child does at home, at school, and in the community, 24 hours a day, 7 days a week." SSR 09-4p.

The statements of a child's parents are part of this review. 20 C.F.R. § 416.924a(a)(2)(i); *see also* 20 C.F.R. § 416.928(a) (stating that an ALJ must take testimony of the person most familiar with a child's symptoms). Ms. Edwards testified that L.T. frequently forgets his daily tasks, and she must remind him to perform certain chores up to five times a day. (R. 70). Her written statements to the SSA also claim that L.T. is "very forgetful" and that he "forgets any and everything." (R. 130). The ALJ found Ms. Edwards' testimony to be fully credible. However, the decision does not mention her statements concerning L.T.'s daily functioning. The ALJ was obligated to explain why L.T.'s limitation in attending to tasks was less than marked when he found it credible that L.T. was forgetful much of the time. Perhaps L.T. functioned differently at home than he did at school, where special education supports were provided. By focusing primarily on L.T.'s school behaviors, however, the ALJ failed to examine how claimant functioned without the supports provided by his structured school environment. This does not comply with the regulations. *See Hamedallah ex rel. E.B. v. Astrue*, 876 F. Supp.2d 133, 147 (N.D.N.Y. 2012) ("A finding of 'less than marked' is unsupported by substantial evidence when the ALJ fails to consider that the child's improvements . . . occurred only in the structured special education setting.") (citation omitted).

Finally, a child disability analysis must always be alert to the possibility that inconsistencies in a child's behavior are themselves a basis for finding a limitation. Ruling 09-1p points out that a child may have a marked or extreme domain limitation "even though the child does not have serious or very serious limitations every day." SSR 09-1p. The

23

Rulings governing the first two domains echo this requirement. Footnote 7 to SSR 09-4p cautions ALJs that a child with a chronic mental impairment may show behavioral fluctuations. Accordingly, an ALJ "must consider any variation in the child's level of functioning to determine the impact of the chronic illness on the child's ability to function longitudinally; that is, over time." SSR 09-4p at n.7; *see also* SSR 09-3 at n.7 (stating the same for the domain of acquiring and using information); 20 C.F.R. § 416.924a(b)(8).

The ALJ did not consider the longitudinal issue in evaluating L.T. The decision does acknowledge that L.T. had good days when he could be on task and act compliantly. But it also states that L.T. struggled to follow school routines, was oppositional and shut down, and sometimes did not know where to go if he did not have intramural sports on a given day. (R. 16). The ALJ did not address the frequency of these bad days, which occurred despite any improvement L.T. had on medication. L.T.'s increased need for special education over time suggests that the school-related effects of his impairments did not improve from 2009 to 2011, but instead required additional services and a more restrictive school environment. The ALJ was obligated to discuss this issue as part of a longitudinal review before he could reach the conclusion that he did. Plaintiff's motion is granted on this issue.

### 3.    Interacting and Relating With Others

This domain of functioning considers how well a child can "initiate and sustain emotional connections with others, develop and use the language of [his] community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). This includes a broad spectrum of behaviors, from forming close relationships to playing with other children on a one-to-one

basis.  *Id*.  The ALJ found that L.T. again had only a less than marked limitation in this area because his school records reflected a generally respectful attitude toward adults.  (R. 19).

Plaintiff objects to this finding on the ground that L.T. requires special education services, including behavioral modifications.  The record does indicate a number of outbursts and disruptive behaviors that troubled school officials.  This includes L.T.'s short suspension from school for striking another child.  That said, the record also substantially supports the ALJ's conclusion.  L.T.'s mother testified that he was loving and kind.  (R. 74). L.T. also regularly participates in intramural sports, including soccer, volleyball, and some track and field.  (R. 62).  The ALJ noted that others found L.T. to be "very social and friendly."  (R. 16).  The March 2011 IEP noted no concerns with L.T.'s communication.  (R. 571).  Plaintiff has not made any showing of why these, and other parts of the record, show why the ALJ should have found that his limitations in this domain were marked or extreme. The Commissioner's motion is granted on this issue.

## IV.  Conclusion

For the reasons stated above, both Plaintiff's motion for summary judgment [17] and the Commissioner's motion for summary judgment [23] are granted in part and denied in part.  The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

ENTERED:

DANIEL G. MARTIN
United States Magistrate Judge

Dated: July 30, 2013